UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>-against-<br><br>AMIT DAGAR and ATUL BHIWAPURKAR<br><br>Defendant. | COMPLAINT<br><br>1:23-cv-5564<br><br>JURY TRIAL DEMANDED |

## COMPLAINT

Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against Amit Dagar ("Dagar") and Atul Bhiwapurkar ("Bhiwapurkar"), (collectively, "Defendants") alleges as follows:

### SUMMARY

1. This action involves insider trading by Defendants in the securities of Pfizer Inc. ("Pfizer") based on material nonpublic information obtained by Dagar, then a Pfizer employee, ahead of Pfizer's November 5, 2021, announcement that its COVID-19 antiviral treatment, Paxlovid, significantly reduced hospitalization and death (the "Paxlovid Announcement"). Pfizer's CEO referred to the Paxlovid Announcement as a "game-changer" in the global efforts to "halt the devastation" of the pandemic.

2. Dagar, a Senior Statistical Programming Lead at Pfizer, was a member of the statistical team that compiled and organized data during Pfizer's Paxlovid clinical trials. In his role Dagar was "blinded," meaning that the data to which Dagar had access did not disclose whether the patients received Paxlovid or a placebo.

3. On November 4, 2021, before Pfizer publicly announced the result of its Paxlovid clinical trial, Dagar learned of the successful result and that Pfizer planned to issue a press release on November 5, 2021.

4. Within hours of learning of the successful Paxlovid clinical trial and the planned press release, Dagar, based on the material nonpublic information he learned about Paxlovid and in breach of his fiduciary duty to Pfizer, purchased Pfizer call options[1] and tipped his friend, Bhiwapurkar, of the successful trial.

5. Bhiwapurkar then traded on the material nonpublic information he received from Dagar and in turn tipped another friend, Individual A, about the successful Paxlovid clinical trial.

6. Following the Paxlovid Announcement, Pfizer's stock price increased $4.76, nearly 11% from its previous close. This was Pfizer's largest single-day stock price move since 2009. Dagar, who purchased $8,380 in Pfizer call options, generated a one-day profit of approximately $214,395 and Bhiwapurkar, who purchased $7,400 in Pfizer call options, generated a one-day profit of approximately $60,300. Individual A, who Bhiwapurkar tipped, generated a one-day profit of approximately $29,770.

---

[1] A buyer who purchases a call option for a specific stock has the opportunity, but not the obligation, to buy that stock for a specific price for a predetermined period.

## VIOLATIONS

7. By virtue of the foregoing conduct and as alleged further herein, Defendants violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

8. Unless Defendants are restrained and enjoined, they will engage in the acts, practices, transactions, and courses of business set forth in this Complaint or in acts practices, transactions, and courses of business of similar type and object.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

9. The Commission brings this action pursuant to authority conferred upon it by the Exchange Act Sections 21(d) [15 U.S.C. § 78u(d)] and 21A(a) [15 U.S.C. § 78u-1(a)].

10. The Commission seeks a final judgment: (a) permanently restraining and enjoining Defendants from violating the federal securities laws and rules this complaint alleges they violated; (b) ordering Defendants to disgorge any ill-gotten gains they received as a result of the violations alleged here and to pay prejudgment interest thereon pursuant to Exchange Act Section 21(d)(3), 21(d)(5) and 21(d)(7) [15 U.S.C. §§ 78u(d)(3), (d)(5) and 78u(d)(7)]; (c) ordering Defendants to pay civil money penalties pursuant to Exchange Act Section 21A [15 U.S.C. § 78u-1]; and (d) ordering any other further relief that the Court may deem just and proper.

## JURISDICTION AND VENUE

11. This Court has jurisdiction over this action pursuant to Exchange Act Section 27 [15 U.S.C. § 78aa].

12. Defendants, directly and indirectly, made use of the means or instrumentalities of interstate commerce or of the mails in connection with the transactions, acts, practices, and courses of business alleged herein.

13. Venue lies in this District under Exchange Act Section 27(a) [15 U.S.C. § 78aa(a)]. Certain of the acts, practices, transactions, and courses of business alleged in this Complaint occurred within this District, including that at all relevant times, Pfizer shares traded on the New York Stock Exchange, which is located in New York, New York and Pfizer maintained its corporate headquarters in New York, New York.

## DEFENDANTS

14. Dagar, age 43, resides in Hillsborough, New Jersey. From at least 2017 until approximately January 2023, Dagar was employed directly by Pfizer. From at least 2009 to 2017, Dagar worked for another company who assigned Dagar to work as a vendor for Pfizer.

15. Bhiwapurkar, age 44, resides in Milpitas, California. Bhiwapurkar is an engineer for a publicly traded computer drive manufacturer and data storage company located in San Jose, California. Bhiwapurkar and Dagar are close friends who both attended the University of Texas at Arlington where they studied electrical engineering.

## OTHER RELEVANT ENTITIES AND INDIVIDUALS

16. Pfizer is a biopharmaceutical company, incorporated in Delaware and headquartered in New York, New York. Pfizer's common stock is listed on the New York Stock Exchange, traded under the symbol "PFE."

17. Individual A resides in San Ramon, California and works for a publicly traded internet search and technology company. Individual A attended college with Bhiwapurkar.

18.     EQIQ Holdings, LLC ("EQIQ") was an investment vehicle that invested in private equity securities registered in Wilmington, Delaware. Dagar, Bhiwapurkar, Individual A, and at least one other individual were partners in EQIQ.

## FACTS

### I.   Dagar's Role in Pfizer's Paxlovid Clinical Trials

19.     Dagar worked in a statistical programming and analysis group at Pfizer, which was responsible for compiling and organizing the data for all clinical trials related to Paxlovid. The group in which Dagar worked was responsible for organizing but not analyzing the Paxlovid data.

20.     Dagar was assigned to the clinical trial that examined Paxlovid's effect on high-risk patients (the "Paxlovid Clinical Trial").

21.     The Paxlovid Clinical Trial was intended to be designed so that it was not possible for Dagar or other members of the group in which he worked to determine the safety or efficacy of Paxlovid from the data the group organized. For this reason, Dagar's group was considered "blinded."

22.     At all relevant times, as an employee of Pfizer, Dagar was required to comply with Pfizer's Code of Conduct and corporate policies, including policies related to insider trading and the safeguarding of material nonpublic information.

23.     Under Pfizer's policies, Dagar owed a duty to Pfizer not to trade on confidential information or advise others to do so; was required to maintain the confidentiality of Pfizer's material nonpublic information; and was prohibited from disclosing to persons outside of Pfizer material nonpublic information without prior approval.

24.     Pfizer's Code of Conduct included an insider trading policy, which stated:

5

> Securities laws and Pfizer policy prohibit us from disclosing or using any material non-public or "inside" information that we acquire during our employment at Pfizer. We do not use material, non-public information to buy or sell the securities of Pfizer . . . before this information is known publicly. We also do not give inside information to anyone else so that they can do so.

25. Pfizer's Code of Conduct also explained that "[m]aterial information is any information that a reasonable investor would consider important" and that "information is non-public until it has been adequately disseminated to the public and the public has had time to absorb the information."

26. Pfizer also had a Corporate Policy for the treatment of material nonpublic information which was consistent with the Code of Conduct and further explained that "information should not be considered public until the first business day after it is disseminated." This policy defined material nonpublic information to include significant clinical drug trial results.

27. Pfizer further had a Corporate Policy which prohibited employees from purchasing or selling options on Pfizer stock.

28. Dagar was aware of Pfizer's Code of Conduct and his obligations having completed a training on Pfizer's Code of Conduct on or about February 23, 2021.

## II.  Dagar Learned of the Results of the Paxlovid Clinical Trial and Announcement on November 4, 2021, Prior to Pfizer's Announcement

29. Pfizer began the Paxlovid Clinical Trial in or about July 16, 2021, as part of the company's "lightspeed" efforts to address the global health pandemic. On November 1, 2021, a Pfizer data monitoring committee received unblinded interim results for the Paxlovid Clinical Trial. The data monitoring committee was charged with reviewing unblinded data from the Paxlovid Clinical Trial and making recommendations.

30. On or about November 2, 2021, a trading blackout notice was distributed to those with access to the unblinded data for the Paxlovid Clinical Trial.

31. On November 3, 2021, after reviewing the unblinded Paxlovid Clinical Trial interim data, the Pfizer data monitoring committee recommended that Pfizer submit a new drug application to the United States Food and Drug Administration ("FDA") for Paxlovid. On the same day, Pfizer sent an email notification and draft press release to the FDA.

32. In the early morning of November 4, 2021, at approximately 5:54 AM EST, Dagar's supervisor received an email informing him that Pfizer would file a new drug application for Paxlovid. The email also disclosed that Pfizer would issue a press release regarding Paxlovid on November 5, 2021.

33. Dagar's supervisor, who like Dagar was blinded from the results of the Paxlovid Clinical Trial, should not have been told of the positive results until he and his group were unblinded.

34. On November 4, 2021, beginning at approximately 8:50 AM EST, Dagar and his supervisor exchanged chat messages in which Dagar's supervisor conveyed the positive results of the Paxlovid Clinical Trial. Dagar's supervisor told Dagar that "we received the outcome" of the Paxlovid Clinical Trial and that Pfizer would issue a "press release tomorrow." Dagar's supervisor also informed Dagar that there would be a "lot of work lined up" due to the results.

35. On November 4, 2021, at approximately 8:57 AM EST, a member of the unblinded side of the Paxlovid Clinical Trial team sent Dagar an email that stated that Pfizer was preparing Paxlovid Clinical Trial data for submission to regulatory authorities.

36. The fact that Pfizer was preparing the Paxlovid Clinical Trial data for submission should not have been disclosed to Dagar who was a blinded member of the Paxlovid Clinical Trial team because it indicated a positive result.

### III. Dagar Purchased Pfizer Options Based on Material Nonpublic Information about the Paxlovid Clinical Trial

37. Approximately four and a half hours after first learning of the successful Paxlovid Clinical Trial, at approximately 1:21 PM EST on November 4, 2021, Dagar purchased $8,380 worth of short term, out-of-the-money call options in Pfizer stock.

38. An out-of-the-money call option is an option that grants the purchaser the opportunity to purchase a stock at a price greater than the price at which the stock is currently selling on the market. The Pfizer call options Dagar purchased on November 4, 2021, granted him the option to purchase Pfizer stock at prices ranging from $44 to $46 at a time when Pfizer stock was trading at less than $43.86. The call options Dagar purchased were also set to expire between the next day, November 5, 2021, and November 19, 2021, which was a two-week period prior to which Pfizer did not publicly state its intent to make a significant announcement.

39. Prior to purchasing Pfizer options on November 4, 2021, Dagar had never before used his brokerage account to trade in Pfizer options and had not traded Pfizer stock since 2018.

40. On November 5, 2021, at approximately 6:45 AM EST, before the New York Stock Exchange opened for trading, Pfizer issued its Paxlovid Announcement. According to the Announcement, after an interim analysis of a randomized double-blind study, Paxlovid was found to reduce hospitalization or death by 89% compared to placebo in non-hospitalized high-risk adults.

41. The Paxlovid Announcement further stated that because of the positive results of the Paxlovid Clinical Trial, Pfizer would end further enrollment in the Paxlovid Clinical Trial and seek emergency use authorization from the FDA.

42. Following the Paxlovid Announcement, Pfizer's stock price increased $4.76, nearly 11% higher than its previous closing price of $43.85. This was Pfizer's largest single-day stock price move since 2009. As a result, Dagar's $8,380 purchase of Pfizer call options generated a one-day profit of approximately $214,395, representing an investment return of approximately 2,458%.

43. Dagar purchased the Pfizer call options, as alleged above, while in possession of and based on material nonpublic information regarding Pfizer's Paxlovid Clinical Trial. The result of the Paxlovid Clinical Trial was material because there was a substantial likelihood a reasonable investor would consider the information important in deciding whether to purchase or sell Pfizer securities.

44. The result of the Paxlovid Clinical Trial was nonpublic because, prior to the Paxlovid Announcement, it was not broadly disseminated generally in the investing public.

45. Dagar knew, consciously avoided knowing, or was reckless in not knowing that the information he possessed about Paxlovid was material and nonpublic.

46. Dagar knew, consciously avoided knowing, or was reckless in not knowing that, by trading on Pfizer's confidential information, as alleged above, he was breaching Pfizer's policies and his fiduciary duty or similar obligation arising from a relationship of trust and confidence to Pfizer.

**IV.     Dagar Tipped Bhiwapurkar with Material Nonpublic Information about the Paxlovid Clinical Trial and Bhiwapurkar Traded on that Tip**

47.     At all relevant times in October and November 2021, Dagar and Bhiwapurkar were longtime friends. Dagar and Bhiwapurkar communicated often via WhatsApp messages and telephone calls about topics including investing in securities and business opportunities.

48.     Dagar, Bhiwapurkar, and Individual A were also partners, with at least one other individual, in EQIQ, a company with at least $1 million in equity, of which at least $600,000 was principal contributed by Bhiwapurkar. EQIQ purchased privately owned shares of stock before companies' initial public offerings.

49.     In addition to purchasing Pfizer securities in his own account, Dagar also tipped his friend Bhiwapurkar with material nonpublic information about the positive Paxlovid Clinical Trial results.

50.     At approximately 3:41 PM EST on November 4, 2021, Bhiwapurkar, using a brokerage account held in his and his wife's names, purchased out-of-the-money call options in Pfizer stock for approximately $7,400. The call options Bhiwapurkar purchased granted him the option to purchase Pfizer stock at $45 at a time when Pfizer was trading between $43.49 and $43.66 and were set to expire on November 19, 2021. As a result of the Pfizer stock price increase after Pfizer released the Paxlovid Announcement, Bhiwapurkar realized a one-day profit of approximately $60,300, representing an investment return of approximately 791%.

51.     Prior to purchasing Pfizer call options on November 4, 2021, Bhiwapurkar had never before used his brokerage account to trade in Pfizer options or stock. On November 4, 2021, after he purchased Pfizer call options, beginning at approximately 3:47 PM EST, Bhiwapurkar sent Dagar three messages using the WhatsApp instant messaging service. Bhiwapurkar later deleted those messages.

52. Dagar tipped Bhiwapurkar for personal benefit, including the benefit of making a gift of material nonpublic information to his close friend.

53. Dagar intended for Bhiwapurkar to trade on the tip, and he knew, consciously avoided knowing, or was reckless in not knowing that the information he communicated to Bhiwapurkar would be used to trade in Pfizer securities.

54. On November 4, 2021, Bhiwapurkar knew that Dagar worked at Pfizer and had access to confidential information about Pfizer's clinical research regarding COVID-19 treatments.

55. Bhiwapurkar purchased Pfizer call options as alleged above while in possession of and based on the material nonpublic information that he received from Dagar. Bhiwapurkar knew, consciously avoided knowing, or was reckless in not knowing, that the information was material and nonpublic.

56. Bhiwapurkar knew, consciously avoided knowing, or was reckless in not knowing that the tip he received from Dagar was conveyed in breach of Dagar's fiduciary duty to Pfizer or similar obligation arising from a relationship of trust and confidence for personal benefit.

**V.   Bhiwapurkar Communicated Material Nonpublic Information about the Paxlovid Trial to Individual A Who Traded on the Tip**

57. At all relevant times in October and November 2021, Bhiwapurkar and Individual A were longtime friends who originally met in college. Bhiwapurkar and Individual A communicated often via WhatsApp, telephone calls, text messages, and in person, and discussed topics including investing in securities and business opportunities.

58. Bhiwapurkar and Individual A were also partners with Dagar in EQIQ, with Individual A serving as the managing member.

59. In addition to trading Pfizer securities in his own account, Bhiwapurkar tipped his friend Individual A to purchase Pfizer securities based on the material nonpublic information that Bhiwapurkar had received from Dagar about the Paxlovid Clinical Trial.

60. On November 4, 2021, beginning at approximately 3:54 PM EST and approximately 13 minutes after Bhiwapurkar purchased Pfizer call options for his own account, Bhiwapurkar and Individual A spoke for approximately forty minutes via WhatsApp.

61. At approximately 3:58 PM EST, while on the WhatsApp call with Bhiwapurkar and just minutes before the New York Stock Exchange closed, Individual A purchased out-of-the-money call options in Pfizer stock for approximately $2,850. As a result of the Pfizer stock price increase after Pfizer released the Paxlovid Announcement, Individual A realized a one-day profit of approximately $29,770, representing an investment return of approximately 945%.

62. Bhiwapurkar tipped Individual A for personal benefits, including the benefit of making a gift of material nonpublic information to a friend.

63. Bhiwapurkar intended for Individual A to trade on the tip, and he knew, consciously avoided knowing, or was reckless in not knowing that that Individual A would use the tip to trade in Pfizer securities

**FIRST CLAIM FOR RELIEF**

**Violations of Exchange Act Section 10(b) and Rule 10b-5 Thereunder
(All Defendants)**

64. The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 63.

65. Defendants, directly or indirectly, singly or in concert, in connection with the purchase or sale of securities and by the use of means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange, knowingly or

recklessly have (i) employed one or more devices, schemes, or artifices to defraud, (ii) made one or more untrue statements of a material fact or omitted to state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (iii) engaged in one or more acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

66. By reason of the foregoing, Defendants, directly or indirectly, singly or in concert, have violated and, unless enjoined, will again violate Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

**PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that this Court enter a Final Judgment:

**I.**

Permanently restraining and enjoining Defendants and their agents, servants, employees and attorneys and all persons in active concert or participation with Defendants from violating, directly or indirectly, Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

**II.**

Ordering Defendants to disgorge all ill-gotten gains received directly or indirectly, with pre-judgment interest thereon, as a result of the alleged violations pursuant to Exchange Act Sections 21(d)(3), (5), (7) [15 U.S.C. §§ 78u(d)(3), (5), (7)];

**III.**

Ordering Defendants to pay civil monetary penalties under Exchange Act Section 21A [15 U.S.C. § 78u-1];

13

## IV.

Granting any other and further relief this Court may deem just and proper.

Dated:   June 29, 2023

/s/ Christopher J. Carney
Christopher J. Carney
Charlie Divine
Colby A. Steele*
Securities and Exchange Commission
100 F Street, NE
Washington, DC 20549
Phone:  202-551-2379 (Carney)
Phone:  202-551-6673 (Divine)
Phone:  202-551-3755 (Steele)
Email:  carneyc@sec.gov (Carney)
Email:  divinec@sec.gov (Divine)
Email:  steelec@sec.gov (Steele)

*Pending admission pro hac vice*

Of Counsel:
Paul E. Kim
Securities and Exchange Commission
100 F Street, NE
Washington, DC 20549